Good morning, Your Honors. Rakesh Kilaru on behalf of the NCAA and if I could reserve three minutes for rebuttal. In O'Bannon, this court drew a distinction between compensation rules and eligibility rules, such as rules limiting the number of years student-athletes may compete in college sports, and it declared the latter set of rules non-commercial and outside the scope of the Sherman Act. Some things have changed in college sports since then. Some things have changed in college sports since then, but nothing that would undermine that basic distinction between eligibility rules and compensation rules. The district court in this case erred in granting a mandatory injunction, changing the status quo for three independent reasons that I'd like to focus on. Counsel, I'm sorry to interrupt, but I'm interested in whether this case is moot to begin with, just for jurisdictional grounds. Why isn't this case moot if the terms of the injunction have effectively ended and both plaintiffs are not expected to either play in another college football season or be eligible to do so under the rules? There's two separate reasons for that, Your Honor. First, the injunction term has not ended. The injunction still restrains the NCAA's membership from applying the rule of restitution to vacate wins during the season or statistics during the season by an ineligible student-athlete. So there's an ongoing legal restriction on the NCAA's membership. Now, no decision has been made whether to do that or not. Has the NCAA ever exercised in these circumstances the rule of restitution against an institution? Well, I think we cite the Jones case in our brief from Texas. It certainly has been a while. I will say- And when was Jones? A long time ago, Your Honor. I wouldn't dispute that. So why would this theoretical possibility of the NCAA enforcing it against a third party have an ongoing case or controversy between the parties here? I think the question, first of all, is simply under the law whether there's a legal restraint that's still imposed by the injunction, and there is. So whether or not practically the NCAA might do it is a secondary question to whether the order is restraining us from doing something we have the right to do under the rules. Now, I do think it is a membership decision that hasn't been made as to whether to enforce the rule of restitution, but I will say that we find ourselves in a somewhat unprecedented situation where there have been 70-plus lawsuits over the last year where ineligible student-athletes are seeking to get an additional season or seasons of athletic competition. So, counsel, what is the exact current status of these two cases? And if it's the same, you can just be more general in your answer. But what's right now the status of these cases in the district court? I believe that in the district court, the proceedings have been stayed. I do believe the term of the injunction, insofar as it grants eligibility, has expired because the students, you know, have finished their season of competition. But I believe there is still an injunction in effect in the district court against the rule of restitution. So we still have the injunction, but is the case also proceeding toward trial or a permanent type injunction or damages or anything else or attorney's fees? I believe as it stands now, it's stayed. I think those issues would be worked out potentially after a remand. But the injunction that is in effect is still in effect as to the But everything else in both cases is stayed? I believe that's correct. Yes, Your Honor. And the stay continues indefinitely? I think obviously we have the appeal and we tried to get it up here as quickly as we could given the circumstances. But I will say in a lot of other cases, even after an appellate reversal, for example, where the season was over, there have been further proceedings in the district court. So we have at least one case, just to give an example, in the Eastern District of Tennessee involving a student athlete named Mr. Ziegler. We won a preliminary injunction or the injunction was denied and the case is proceeding for damages purposes based on the season. Oh, I should know the answer to this and I apologize. But was it was the did the complaints seek damages as well as a declaratory or injunctive relief? I don't believe it did, as it's stated right now, Your Honor, but we can confirm that when we come back up. So on the rule of restitution, if we were to find that if we were to believe that this case was moot and dismissed it, wouldn't we normally vacate the district court's injunctions under Munsingware, in which case the NCAA would be free to go and enforce the rule of restitution against the institutions? Yes, Your Honor. I think if the court were to declare the case moot, that would be the appropriate outcome. And we don't think there's actually a contested dispute between the parties as to whether a vacature would be appropriate under Munsingware. Now, independent of the rule of restitution, we also think that under this court's decision in A.D., this case falls within the capable of repetition but avoiding review exception. I mean, A.D. is an interesting case. It's a little bit unusual because there you had an age cutoff under the IDEA, if I remember. Once you hit 20, regardless of what was happening in the case below, once a person aged out, nothing could happen. The case would end because there was no statutory protection. But you don't have an age out provision here. It's about eligibility for a future season with the NCAA or, I mean, with a Division I football program or two. Why does that make that distinct? There's not an age restriction per se, but there is the same issue of a kind of permanently transitory issue. Because in every one of these cases that's come up, and like I said, there have been 70 of them, it's a student seeking one more season of competition and saying this is my last season. So it's effectively the same as an age issue in that there's one season and there's probably six months in which the issue can go from preliminary injunction motion being filed to the issue, the season being over. But it wouldn't have to be, right? Suppose you have a student that has two years at a junior college and then they transfer to a Division I program and let's say they're registered for one year and then they play two years of Division I football. They would be ineligible, I believe, under the five-year rule. But if they prevailed, either the district court on appeal to say that the junior college years shouldn't count, they would be, a court order could allow them to be eligible to play more time in Division I. In other words, I just don't know that this is the case for it. I'm not seeing why this issue would evade review under the right circumstance or where a plaintiff appeals in one of the many cases that the Bureau, I think it has evaded review. I mean, it evaded review in Pavia, though I do think that case was distinguishable from this one. I think it may well evade review here insofar as the decision was issued. We filed a motion to expedite the appeal. We tried to get here as quickly as we could. Now the argument is, well, the season's over. You can't get review of the order. But what about my hypothetical? I mean, in that sense, that person or the parties would have a two-year runway then, right, between the district court and appeal in order to resolve the merits of the antitrust issue. I think that might be true, Your Honor, but I think there's respectfully two problems with that hypothetical. The first problem with that hypothetical is that in your situation, unlike here, you know, we would have, I think that goes to the irreparable harm analysis we eventually get, which is that what's actually happening are that students are not filing suit when they think they might want an extra year, but are filing suit on the eve of the additional season. But I will also say descriptively in these cases, they're not being filed two years in advance, one year in advance. They're being filed the day before the season starts. In this case, I think even in one of the cases, even after the season started. And so the practical circumstances in which this case is being litigated again and again and again is evading review. And we can't control when students sue us, right? So it's not like we can go to the student and say, hey, we think you might want additional eligibility in three years, so let's go litigate that now. We have to be in the position of waiting until they sue us, and that lawsuit is almost inevitably happening on the eve of the season when there's four to six months at most. Do you think you're, is AD the best case in your view for the proposition that you're asserting that it's, that the capable of repetition doctrine should be applied? I think it is, Your Honor, but I also think if you look at, for example, the only case that's found these moots so far was the Pavia case. And this issue I will say is being litigated in the Robinson case in the Fourth Circuit right now. So obviously if that decision comes out and one way or another, we'll submit it to the court. But Pavia was quite different from this circumstance in that the NCA had granted a longer term waiver and the court there didn't have precedent like AD that specifically suggested that it's not just the person who was the plaintiff in the court below who has to have a chance of recurring as to them, but it could be the defendant, which is the exact circumstances. And I'll let my colleagues, I think they want to follow up with this. But what concerns me is that the doctrine from the Supreme Court on down with Lyons is primarily about the plaintiff's complaining party, having something recur to the plaintiff themselves, to that particular party, and not to the defendants. Because if you were to imagine if it could be something recurring to a defendant, then many cases would have been written differently. You know, in Lyons, it would have been justiciable because the LAPD was doing chokeholds on other people in L.A. And I mean, I can think of many other cases, right, in Honig and others. But here what's indisputable is the plaintiffs are not indisputably not going to go play another season of college football. So what makes this case sufficiently different enough to fit it within the AD context than in all the other cases that really primarily focus on a plaintiff? I mean, I really do think it's quite on all fours with AD in the following senses. In both cases, you had a district or a court order that gave a plaintiff essentially what they were hoping to get in the district court. That's exactly what happened in AD. By the time the case came up on appeal, the plaintiff had, in AD it was aged out, but here finished their season of competition. So a time-based duration bar had expired. And the question is, can the complaining party, we would say us, which I think in the school district was complaining party in AD, continue with the case because the issue is likely to recur to them? And I don't think there can be any reasonable dispute. No, I think that the complaining party was the plaintiff in the school case, as the underlying plaintiff. Understood, Your Honor. But the complaining, if that is true, then the court didn't agree with that being the complaining party because they said that even if the complaining party was the plaintiff, which I don't think it was, but even if it was, the school district could still get appellate review of the issue because the issue was going to recur to them. So in that sense, exactly the same as the situation you have here where we are the NCAA, we are coming into court, and we're saying this situation is going to recur to us, and there is just no theoretical debate about whether this is going to recur because it continues to recur. Obviously, we recognize that, Your Honor, so granted expedited argument in another case, but that's one example of the issue recurring. Another case where the motion for PI was filed on the eve of the season, and it takes kind of extraordinary judicial work, which we appreciate, to get that case resolved on the merits. But even then, you know, the argument's in a couple weeks, and the decision, you know, if the rule is the complaining party has to have a stake, it puts an immense amount of pressure on the courts as well. Did you want to talk about the merits a little bit? If I could briefly, yes, that would be great, Your Honor. I think there's, as I said, three different independent merits issues, one of which is specific to the Martinson case. To start, in O'Bannon, this court distinguished compensation rules from eligibility rules and said that eligibility rules are non-commercial. But, you know, I guess I read O'Bannon, I read that line to be a little differently, more as indicative rather than as part of the holding, and it seems like the landscape changed under, after Alston, right, where different types of rules are considered commercial rules. I mean, if you were right, then wouldn't the NCAA just be able to sort of mask any type of commercial effect rule as just an eligibility rule? And I think Alston essentially rejected that sort of argument. So a few things there, Your Honor, but I would say first, I don't think it's dicta because the core question in O'Bannon in that portion of the opinion was whether or not the compensation rules were eligibility rules or not. They were outside the scope of the rule of reason, and so the court specifically said compensation rules are in under the rule of reason, eligibility rules are out. I think separately, to answer your question, it would come to whether or not it's an eligibility rule or not. I mean, we made the argument in O'Bannon that a compensation rule was an eligibility rule, and we lost, and we haven't made the argument since. But we have made it in the context of rules that I think are indisputably eligibility rules that are about how many seasons of competition you can have, which is the exact type of eligibility rule that was described as such in O'Bannon. But I mean, going back to first principles, those are eligibility rules that probably indisputably have a commercial effect, right, with the amount of money that's in college football and in college basketball, especially, and the ability of someone to either be in a four-year major program or not, and the monetary difference and whatever anti-competitive effects there might be, there's quite a bit of a commercial component to this, isn't there? I think, as I said at the beginning, things have changed, obviously, since O'Bannon, but I don't think in a way that's material for this argument. Even in O'Bannon, the question was whether or not student athletes could get additional NIL compensation. That was a specific question in O'Bannon. The court allowed certain forms of additional NIL compensation, less than is now allowed, but it was in the context of a decision saying there can be more NIL compensation on top of the hundreds of thousands of dollars of value that comes from a college degree that you get as a result of being eligible. Let's say, even if we don't agree with you about O'Bannon, why else would you win? So there's two other reasons, which I guess I'll address briefly. One is in the Martinson case, there's no dispute that the judge applied the quick look, and I think that's clearly wrong under Alston. If the argument is that Alston says that the rule of reason applies to NCA rules, and Alston applied the rule of reason to a rule that literally restricted compensation, I don't think there could be any reasonable argument that the rule of reason shouldn't also apply to the eligibility rules here. And then last, in both cases, there's a simple evidentiary problem, which is that an antitrust case needs antitrust proof. There needs to be evidence of the relevant market. There needs to be evidence of anti-competitive harm. And the record in this case is indistinguishable from the Forker and Case out of the Seventh Circuit recently. In your view, there were some declarations, there were some affidavits, there was no real expert evidence defining the relevant markets and analyzing the, in your view, the required rule of reason calculus. I think that's exactly correct, Your Honor. And if I may just finish the point, this is pretty much on all fours with the recent Elad decision out of the Third Circuit, where the court said, if you're going to take the position that the market has changed because of NIL and because of compensation, you need to do some economic analysis of the new market, and there was zero economic analysis in the record here. All right, thank you, counsel. Thank you. Good morning, Your Honor. May it please the Court, my name is Greg Clifton. I'm here representing Cortez-Bram and Tatuah-Martinson with regard to the appeal that was filed by the NCA in both of those cases. We feel very strongly, and if you don't mind, I'm going to respond to my opposing counsel for a moment, if I could. He mentioned O'Bannon quite a bit. O'Bannon is a 10-year-old case from 2015. Since 2015, which I think Your Honor acknowledged slightly, there's been a lot of changes in the college world. O'Bannon did not authorize what we've seen, and literally, when we had oral argument on the Cortez-Bram case, which was on July 2nd, the day before effectively what had happened, all of a sudden, NCA schools could now pay $20.5 million to their student-athletes. So the argument that there is not anything commercial, and if you watch some of the other cases that have been revolving and some of the signings through NIL, anyone who says this was not a commercial, it is not a commercial issue, I think is really just off base. Counsel, can you start with mootness? I'm sorry? Can you start with mootness, the jurisdictional issue before us? Why does the rule of restitution that I believe is still currently in effect make this case moot, nonetheless? Well, I think the reality, the rule of restitution is something now that the NCA is attempting to utilize to shut down the legal rights that student-athletes have to file lawsuits. Well, regardless of whether the NCAA is trying to do it, it's in the order, isn't it? It's what? It's in the court's order. Yes, it is. In both court orders, it is specifically prohibited, the NCA is prohibited from going forward with the rule of restitution. But doesn't that mean the case is not moot? I don't know what you mean, Your Honor. Well, how can the case be moot if there is an extant order that forbids conduct right now? Well, if you analyze the other components of the mootness doctrine here in the Ninth Circuit, it's what I would call a two-prong test. It's not really a test, but there's two prongs to it. And both of those prongs have to be satisfied by the NCAA. As we briefed and submitted to you, we don't think the second prong of that has been in any way, shape, or form addressed by the NCAA. The reality is these student-athletes that we are representing have no eligibility left. I understand that. But the restitution rule bar, which you just said is in effect, it bars the NCAA right now from taking certain actions. So how can the case be moot? Even if the aspect relating to eligibility is moot, how can the aspect relating to the rule of restitution be moot if it's in the district court's order and right now it stops the NCAA from acting? Well, the reality is, Your Honor, there is no dispute right now. The bottom line is the case is over. So the NCAA is just trying to perpetuate this case to try . . . But how is the case over, even if it were over as to the client's eligibility, how is it over as to the rule of restitution? Well, if the NCAA seeks to move forward on the rule of restitution, I don't believe either one of these clients are involved in that. Because if you look at the prong, the two prongs in the rule of restitution argument for mootness, they have not satisfied that second prong whatsoever because there's no longer an ongoing dispute between that individual, whether it be Cortez Brame or Tatuah Martinson, with the NCAA. They don't have any dispute. There is no opportunity for either one of those clients now to go ahead and re-sue or file another action against the NCAA. So . . . Go ahead. I'm sorry. Thank you, Judge Sanchez. Counsel, I don't . . . I was having a hard time trying to understand your logic on the restitution issue until I think I just got what you're . . . I think I just . . . I think I understand what your argument is at this point. Please help me, all right? Yes. Thank you. Happy to. My understanding is that what you're saying is that the restitution argument in this case is particularized and is inextricably entwined with the underlying case involving each of your clients. And that if your client's case is moot, the restitution order then would be moot. Is that your argument? That is my argument. And that is our belief.  That's where I see it. I mean, I guess what I would . . . the way I think about your argument is there is no ongoing case or controversy between your clients and the NCAA because they have no interest in whether the NCAA pursues restitution against the institutions with which they formally played. But the next issue is they have no standing, in my opinion, against either institution because either institution was never put on notice. They were not part of this lawsuit in any way, shape, or form. One of the athletes attended the University of Memphis. The other athlete went to San Diego State. Neither one of those schools has been involved in this lawsuit in any way, shape, or form. So seeking restitution against them . . . Is the language . . . It's not like seeking restitution against a school who plays an ineligible athlete, for example. Is the language the district court put in the order as to the rule of restitution language you requested? I don't . . . I'd have to look at that closely, Your Honor. I believe we put in there that the rule of restitution should not apply simply because we think the rule . . .  So you asked the district court to do what it did. Correct. All right. Moving to another aspect of mootness, and I'm looking at the Where Do We Go Berkeley case. The court there said, based on the cases which it cited, including the A.D. case, which I'm preliminary injunction, either in this case or in a similar case, would be similar enough to count as a recurrence. So the court in Where Do We Go Berkeley specifically talked about that the ability of cases other than this one to recur with the exact same issues and similar time problems is enough to prevent a case from being moot. Why isn't that the exact circumstance here, where, as your friend points out, these lawsuits typically are filed right before the season starts? There's no time to get the appeal heard before the season ends? If I can . . . I don't mean to interrupt you. I'm sorry, Your Honor. If I could address that. The reason these lawsuits are filed the way they are filed, as you will see in our documents that we filed and our pleadings that we filed, both of these cases, in specifics, the Cortez remedies through his school, which was seeking a waiver for eligibility. His school refused to file that on his behalf. Despite multiple requests . . . But even if . . . But let's assume, I have no reason to believe it isn't, assume that's true, the Where Do We Go Berkeley case talked about that you can also look at whether the issues are going to occur in different cases and similar, even with different parties. So we know that happens. We know these cases get filed right before the season, whatever the reason. We know they don't get, typically, appellate decisions before the season is over, although we know that there's another case coming up that will be heard in April. But why doesn't Where Do We Go Berkeley control when it talks about you can have a mootness exception based on recurrence in a similar case? I think that there would never be any mootness ever in any of these cases under that assessment, Your Honor. The reality is every single one of these cases could be argued for mootness, as we have done and we've presented to you. So that only applies . . . . . . when the season is over before the case can get to appeal. I mean, that's the only . . . that would be the only reason why you would say there would never be mootness, because in the cases we're talking about here, the season is whatever, three months, four months, and that's the definition. And by the time the season is over, well, we have no more interest in this case. Let's move along. Well, I don't know if there was a question there, Your Honor, so I want to be responsive to you. The reality is these cases are filed as quickly as possible, after they can be filed, after the NCAA, as I mentioned a few minutes ago, refuses to honor the waiver request. They deny it. Then they can appeal it. They deny it again. So these young men who want to play, and we haven't even gotten into that aspect of our argument yet, but they are being prevented, not being able to seek an extra year of eligibility based upon NCAA rules over student-athletes they don't even have any jurisdiction over. The NCAA does not have jurisdiction over junior college players, yet they continue to try and enforce a rule and prevent these junior college athletes from having a chance to play that extra year or two. They count those years, even if they didn't play, against their five . . . four years and five-year rule, or the five-year rule, as it's called, the eligibility clock. They count that. So the reality is all these issues prevent these student-athletes from having any basis to try and seek an extra year of eligibility, which they should be entitled to, which to us is a crucial, crucial issue that these student-athletes, especially despite my opposing counsel's continued reference to O'Bannon, as I mentioned a few minutes ago, these young men have an opportunity to secure large amounts of money. Large amounts. Mr. Clifton, what evidence did you present to the District Court about antitrust injury and what the relevant market should be? Well, the relevant market issue, which had already been decided, which we presented to them and which both judges in both different cases agreed with us on, is the Division I college football market. So it's a fairly defined market. Clearly it's not baseball players, it's not hockey players. It was, in our case, we defined it as the Division I football players nationwide. That's the relevant market. And that's what we believe. What evidence was presented to support that that should be the relevant market? There was just an oral argument. You know, substitutes, other ways, you know, because this is a labor market and are there substitutes to that market where players could play elsewhere? When I look at the merits of this case, I see very little presented to the District Court. I don't know how to respond to that. We thought we presented quite a bit of evidence, Your Honor, to support our position from initially discussing the quote-unquote eligibility rules and how they were a restraint upon these student athletes and a proper restraint that should not have been authorized. We went there. We went through the rule of reason analysis in both cases in great depth, which both judges addressed in great depth in their opinions, six, seven, eight pages of analysis. So there was quite a bit of evidence introduced, which both judges relied upon. Were there any experts that submitted anything? No, we did not use any experts in our cases. Understanding this, Your Honor, which is difficult, I know it's not your problem, it's my problem, these were both college students who do not have great financial means, and at that point they were being prohibited from securing any type of NIL-type remuneration because they were being denied the opportunity to play. So the reality is we were limited from a funding perspective, but we were not limited in terms of our oral arguments and the evidence we produced. So what is your response to the two-circuit decisions of Elad and Forcorian, which I think on similar grounds reversed district courts because they had not presented, because those preliminary injunctions were not supported by substantial evidence of actual antitrust injury, and those are the things that come up under a rule of reason analysis. Well, I think if you look at our submissions, you will see that in the rule of reason analysis that was provided by both judges, we had provided detailed, sufficient information regarding why, under the rule of reason analysis, why we had satisfied those components. So we did not ignore them in any way, Your Honor. Well, for example, I didn't, the only evidence that I saw with respect to the anti-competitive effects was, with respect to the anti-competitive effects was that your clients were not allowed to play in the Division I programs, but not being able to enter the market doesn't make it anti-competitive necessarily. Well, the number of issues, one of which is the NCAA had argued that there's no big deal if they miss a season of eligibility. Well, that is a big deal for a student athlete. They lose out, as we're going to see with Cortez Brame as being an example. He is now preparing for the NFL draft. He would not have had that opportunity but for the judicial order by Judge Hsu. So the reality is we presented evidence which showed if you were not able to play, and there was a lot of case law that says there is irreparable harm if you are denied the opportunity to play, whether it be for a brief period or whether it be for a season. By not being able to play, they would be denied the opportunity to be reviewed and analyzed by Pro Scouts, denied the opportunity to learn and be improved by the college coaching staffs that they'd be on their own. I don't doubt that your client would have material impacts about not being able to play, but antitrust injury is a broader analysis about the anti-competitive effects to markets and how these rules affect the entry into markets and whether that's anti-competitive. So it often doesn't involve just the individual and what that might impact on them, but this broader economic analysis. No, I think what's important, Your Honor, is in both of these cases, we were analyzing the rules of the NCAA, the bylaws, that they have no authority to have any control over junior colleges. They have numerous exceptions to their rules. Right now, I can recite numerous names where they're allowing athletes who were drafted, who played professional basketball, to come back and receive four-year scholarships and come back into college. The reaction to that from college coaches of great renown, for example, Mr. Izzo in Michigan State and even Rick Pitino, who's now at St. John's, they were outraged by the fact that the NCAA is allowing these athletes to come back. We're seeing athletes, again, they talk about worrying about age and all those things. In fact, there's a gentleman who won the Heisman Trophy at 27 years old. Counsel, you're out of time. Do you have a final statement you'd like to make? Yes, I do. Thank you, Your Honor. Appreciate that. Yeah, what I'd like to do is hope Your Honors will consider what we filed. I know opposing counsel has spent quite a bit of time on the mootness angle. That was a separate motion that we filed, which again, I was not sure we were going to be addressing and discussing today because we had never heard from Your Honors prior to this with regard to that motion that was filed in February. What I would like to do is just, if I could wrap up, is just quickly, I'll do it very quickly, just ask you to once again, review our submissions, review our angles and our arguments that we made as to why the NCAA's expression of restricting these junior college athletes and denying them the right to play when they have no jurisdiction technically over these junior college athletes, and yet they're denying them. And then from an overall perspective, the opportunity to secure any type of NIL dollars because if they don't play and they can't transfer, they cannot secure the tens of millions of dollars that are now being distributed to these student athletes who are able to transfer. Again, I thank you. Thank you. Counsel, we'll give you two minutes for rebuttal. Thank you, Your Honors. Maybe a minute on mootness and a minute on the merits. On the mootness issue, from a rule of restitution perspective, there is an order in place preventing the NCAA's membership for potentially taking an action that they could take. I don't hear the other side to be saying that their clients have no interest in their records from the season, their statistics from the season. Can I, can I, can I, excuse me, can I ask you a quick question? First of all, it appears these, these young men have graduated. I don't know when they graduated, but they're done. They're not playing football, right? Anymore in college. That's correct. The colleges themselves didn't do anything here. They were not a party to this case. They didn't induce these young men to get a waiver. They didn't issue the injunction. They didn't seek it. Why in the world would the NCAA have any interest whatsoever in attempting to seek restitution from an institution under these circumstances? I think, I mean, how in the world would they even base it? What did the, what did these institutions do? They followed a court order? Your Honor, they rostered players who were ineligible under the rules that they agreed to as members of the NCAA. Now, I want to be, listen, they, these were, these were players that they had wanted to have play for them. The, they, they, one of them asked, get it, get a waiver. And the school said, no dice. We're not doing it on several occasions. And then a court order comes down and says, these people are eligible to play. You have to let them play. And then the NCAA is going to go after the school? You and I both know that is never going to happen. Your Honor, just, I guess, a few things. First, I'm not saying that any decision has been made to do that. In fact, one hasn't. But I am saying that there's a legal restriction on even doing that, which is a penalty that's prescribed by the rule book to which the schools agreed. Isn't it illusory? Isn't it really illusory? Your Honor, I don't think it is because it's a penalty in the rule book that the schools agreed could be applied to them. I see my time is up, so I guess we'll leave it there, Your Honor. No, I apologize. I'll leave it to Judge Bennett. No, that's okay. We thank counsel for their arguments. Okay, thank you very much, Your Honor. The case just argued is submitted. With that, we are adjourned for the day and the week. We thank counsel for their arguments. Thank you. All rise. This court for this session stands adjourned.
judges: BENNETT, SANCHEZ, Ezra